**Slip Op. 99-46**

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: POGUE, JUDGE

<table>
<tr><td>

MITSUBISHI HEAVY INDUSTRIES, LTD.

     and

TOKYO KIKAI SEISAKUSHO, LTD.,

        Plaintiffs,

     v.

UNITED STATES,

        Defendant,

     and

GOSS GRAPHICS, INC.,

        Defendant-Intervenor.

</td><td>

Consol. Court No. 96-10-02292

(Japan)

</td></tr>
</table>

[Final results of Commerce's redetermination sustained in part and remanded in part.]

Decided: May 26, 1999

Steptoe & Johnson LLP (Anthony J. LaRocca, Richard O. Cunningham, Eric C. Emerson, Gregory S. McClure) for Plaintiff Mitsubishi Heavy Industries, Ltd.; Perkins Coie LLP (Yoshihiro Saito, Mark T. Wasden), for Plaintiff Tokyo Kikai Seisakusho, Ltd.

David W. Ogden, Acting Assistant Attorney General, Civil Division, U.S. Department of Justice; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; Randi Rimerman Serota, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; Robert J. Heilferty, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for Defendants.

Wiley, Rein & Fielding (Charles Owen Verrill, Jr., Alan H. Price, John R. Shane, Leslie Johnson Pujo) for Defendant-Intervenor.

**OPINION**

**POGUE, Judge:** On June 23, 1998, this Court remanded certain aspects of the U.S. Department of Commerce's ("Commerce") determination in <u>Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan</u>, 61 Fed. Reg. 38,139 (Dep't Commerce, July 23, 1996)(final determ.)("<u>Japan Final</u>"), as amended by <u>Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan</u>, 61 Fed. Reg. 46,621 (Dep't Commerce, Sept. 4, 1996)(antidumping duty order and amend. to final determ.). See <u>Mitsubishi Heavy Industries, Ltd. v. United States</u>, 22 CIT ___, 15 F. Supp.2d 807 (1998)("<u>Mitsubishi</u>").[1]

Specifically, the Court directed Commerce: 1) to correct its error in allocating Plaintiffs' indirect selling costs incurred in Japan; 2) to explain its decision to adjust normal value for imputed credit expenses; 3) to reevaluate its decision to treat certain suppliers of MHI's as affiliated parties; 4) to reconsider its decision not to treat a trading company and MHI as affiliated

---

[1]In that proceeding, Plaintiffs Mitsubishi Heavy Industries, Ltd. ("MHI") and Tokyo Kikai Seisakusho, Ltd. ("TKS"), respondents in the underlying investigation, and Plaintiff Goss Graphic Systems, Inc. ("Goss"), petitioner in the underlying investigation, filed separate motions challenging various aspects of Commerce's determination.  The motions were consolidated.
Moreover, the antidumping investigation of large newspaper printing presses ("LNPPs") from Japan was conducted simultaneously with Commerce's investigation of sales of LNPPs from Germany.  Issues common to both investigations were discussed in <u>Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany</u>, 61 Fed. Reg. 38,166 (Dep't Commerce, July 23, 1996)(final determ.)("<u>Germany Final</u>").

parties; and 5) to reconsider its decision to treat LNPPs sold in the home market as foreign like product.  See id. at ___, 15 F. Supp.2d at 834.

The Commission issued its final remand determination ("Remand Determ.") on December 21, 1998.

## Standard of Review

The Court will uphold a Commerce determination in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" Section 516A(b)(1)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(b)(1)(B)(i)(1994).

## Discussion

### I.  Plaintiffs' Indirect Selling Expenses Incurred in Japan

In the underlying proceeding, Commerce determined the U.S. price based on constructed export price ("CEP").[2]    The CEP

---

[2]Commerce calculates an antidumping duty by comparing an imported product's price in the United States to its normal value ("NV")(i.e., the price of comparable merchandise in the exporting country).  The dumping margin is the amount by which the normal value exceeds the U.S. price.  See 19 U.S.C. § 1673(1994).

The United States price is calculated as either the "export price" ("EP") or the "constructed export price" ("CEP").  See 19 U.S.C. § 1677a.  Typically, Commerce uses EP when the foreign exporter sells directly to an unrelated U.S. purchaser.  See 19 U.S.C. § 1677a(a).  Commerce uses CEP when the foreign exporter sells through a related party in the United States.  See 19 U.S.C. § 1677a(b).

NV is the price of the merchandise in the producer's home market or its export price to countries other than the United States.  See 19 U.S.C. § 1677b(a)(1).  Where Commerce cannot compute the home-market price, Commerce may base NV on a constructed value ("CV"), see 19 U.S.C. § 1677b(a)(4), which is

provision requires Commerce to reduce the price at which the subject merchandise is first sold to an unaffiliated customer in the United States by the amount of selling expenses "incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise . . . ." 19 U.S.C. § 1677a(d)(1)(1994).  Indirect selling expenses are a component of selling expenses.[3]  See 19 U.S.C. § 1677a(d)(1)(D)(requiring Commerce to deduct from CEP any selling expenses not deducted as commissions, direct selling expenses, or selling expenses that the seller pays on behalf of the purchaser). The statute limits CEP deductions to "expenses . . . associated with economic activities occurring in the United States." Statement of Administrative Action, H.R. Doc. No. 103-316, 103rd Cong., 2nd Sess. (1994), reprinted in URUGUAY ROUND AGREEMENTS ACT, LEGISLATIVE HISTORY, Vol. VI, at 823 ("SAA").[4]  This Court has held that "[e]xpenses incurred outside of the United States could still be 'associated with' economic activities occurring in the United

---

calculated pursuant to § 1677b(e).

[3]"Indirect selling expenses are selling expenses that the seller would incur regardless of whether particular sales were made but that reasonably may be attributed, in whole or in part, to such sales (e.g., salesperson's salaries)."  Antidumping Manual, Ch. 8 at 44.

[4]The Statement of Administrative Action represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements . . . ."  SAA at 656.  "[I]t is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement."  Id. (quoted in Delverde, SrL v. United States, 21 CIT ___, ___, 989 F. Supp. 218, 229-30, n.18 (1997)).

States."  Mitsubishi, 22 CIT at ____, 15 F. Supp.2d at 818. Therefore, in the present matter, Commerce properly decided to deduct indirect selling expenses incurred by the Plaintiffs in their home market of Japan associated with their exports of LNPPs to the United States.  See id.

Based on the information reported by the Plaintiffs at verification, however, Commerce was "unable . . . to quantify the portion of the [Plaintiffs'] total indirect selling expenses [incurred in Japan that] were associated with the U.S. sales." Germany Final at 38,174.  Therefore, Commerce derived a methodology to accomplish the deduction as non-adverse facts available.  See id.  Commerce multiplied the total indirect expenses incurred in Japan by the ratio of all other CEP deductions made under 19 U.S.C. § 1677a(d)(1) to the contract price net of the total indirect selling expenses incurred in Japan.  See id.

Commerce subsequently concluded, however, that in applying this methodology, Commerce inadvertently overstated the amount of indirect selling expenses to be deducted from CEP.  Specifically, Commerce explained that the pool of indirect selling expenses incurred in the home market and allocated to MHI's U.S. sales included "various office and planning expenses . . . [that were] not the type of expenses that ordinarily would be associated with United States economic activity."  Response Court's Apr. 21, 1998 Ord. Regarding Treatment Indirect Selling Expenses at 2.  Because Commerce's determination was based on a factual error, this Court remanded the matter to Commerce to evaluate whether its allocation

methodology either understated or overstated MHI's indirect selling expenses and to correct the error.  See Mitsubishi, 22 CIT at ___, 15 F. Supp.2d at 819.

On remand, Commerce "concluded that the ratio should [have been] applied to a smaller pool of indirect selling expenses incurred in Japan than [had been] used in the Final Determination." Remand Determ. at 3.  Specifically, Commerce removed the following types of expenses incurred in Japan from the indirect selling expense pool: salaries and related expenses, office expenses, planning expenses, consumable stationary expenses, book and printing expenses, insurance, employee education, and department, section, and other charges.  See id.  Commerce concluded, "In the absence of record evidence to the contrary, it would be unduly punitive to presume that such expenses were incurred on the sale to the unaffiliated customer in the United States."  Id.

The SAA states that "[CEP] is now calculated to be, as closely as possible, a price corresponding to an export price between non-affiliated exporters and importers."  SAA at 823.  MHI now argues that Commerce's methodology is "arbitrary" because it does not ensure that "indirect selling expenses consistent with an EP transaction [will] not be deducted."  Cmts. of Pl. MHI on Remand Determ. at 3-4.  MHI maintains that, while Commerce's methodology may properly allocate a portion of the indirect selling expenses incurred in Japan to the economic activities occurring in the United States, "the objective of the allocation is to identify only those expenses that are inconsistent with an EP transaction."  Id.

at 4. Because Commerce did not explain how its methodology fulfilled this objective, MHI argues, its methodology should be rejected. See id.

Regarding this matter, however, the Court has already held that "[19 U.S.C. § 1677a(d)(1)] does not require . . . Commerce [to] examine every potential CEP deduction to determine whether the activity generating the expense would be inconsistent with an EP transaction." Mitsubishi, 22 CIT at ___, 15 F. Supp.2d at 818. Under the statute, Commerce has the authority to deduct indirect selling expenses that are associated with the sales of exports in the United States from CEP, whether incurred in the United States or the home market. See id.

Here, as noted, Commerce was able to confirm that certain of the home-market indirect selling expenses were associated with U.S. activity, but was unable to quantify the exact portion of such expenses attributable to U.S. sales based on the information reported. See Germany Final at 38,174. Therefore, as non-adverse facts available, Commerce multiplied the total indirect selling expenses incurred in Japan by the ratio of all other CEP deductions made under 19 U.S.C. § 1677a(d)(1) to the contract price net of the total indirect selling expenses incurred in Japan. See id. Because it was reasonable, under the circumstances here, for Commerce to assume that the percentage of the home-market indirect selling expenses associated with U.S. economic activity would correspond with the remaining 19 U.S.C. § 1677a(d)(1) CEP deductions' percent share of the contract price, Commerce's

methodology was in accordance with law.

In addition, both MHI and Goss argue that Commerce's calculation of home-market indirect selling expenses was unreasoned because the agency failed to articulate a standard for determining which expenses should have been included in the pool of home-market indirect selling expenses to which the ratio was applied.  See Cmts. of Pl. MHI on Remand Determ. at 4; Rebuttal of Goss to Cmts. of MHI at 4.

The Court disagrees.  Commerce reasonably interpreted the statute as requiring it to deduct from CEP indirect selling expenses that were associated with economic activities occurring in the United States.  See Mitsubishi, 22 CIT at ___, 15 F. Supp.2d at 818; see also SAA at 823 ("[CEP] will be calculated by reducing the price of the first sale to an unaffiliated customer in the United States by the amount of the [statutory] expenses . . . associated with economic activities occurring in the United States[.]")(emphasis added).

Therefore, the standard Commerce applied was self-evident: Commerce excluded from the pool of indirect selling expenses incurred in Japan those expenses that were not generally associated with the sales of LNPP exports in the United States (i.e., salaries, office expenses, planning expenses, consumable stationary expenses, book and printing expenses, insurance, employee education, etc.).  See Remand Determ. at 3.

In this regard, Commerce had to "'reason its way to a decision without pretending that that decision reflected some degree of

rational perfection . . . .'" Mitsubishi, 22 CIT at ___, 15 F. Supp.2d at 831 (quoting Fishermen's Dock Co-op., Inc. v. Brown, 75 F.3d 164, 173 (4th Cir. 1996)). "'Where the agency's line-drawing does not appear irrational and the [plaintiff] has not shown that the consequences of the line-drawing are in any respect dire . . . [the court] will leave that line-drawing to the agency's discretion.'" Id. (quoting Leather Indus. of America, Inc. v. E.P.A., 40 F.3d 392, 409 (D.C. Cir. 1994)). In its remand determination, Commerce stated, "In the absence of record evidence to the contrary, it would be unduly punitive to presume that [certain expenses]" were associated with economic activities occurring in the United States. Remand Determ. at 3. Therefore, based on the evidence before it, Commerce's decision on remand to exclude certain expenses from the pool of home-market indirect selling expenses was a permissible exercise of its discretion to draw the lines in this case.

Because Commerce's methodology was in accordance with law, the Court sustains Commerce's remand calculation of MHI's indirect selling expenses incurred in Japan.[5]

---

[5] In our original decision, this Court also directed Commerce to respond to TKS's argument that Commerce overstated its indirect selling expenses in the same way it overstated MHI's. See Mitsubishi, 22 CIT at ___, 15 F. Supp.2d at 819. Accordingly, Commerce reviewed the matter and determined that CEP should not be reduced by the amount of TKS's indirect selling expenses incurred in Japan because Commerce found no record evidence of indirect expenses based on U.S. economic activity for TKS. See Remand Determ. at 4 (citing TKS Home Market Verification Report (Conf. Doc. 191)(May 14, 1996) at 16). Moreover, TKS agrees with Commerce's determination on remand not to reduce CEP by the amount of indirect selling expenses incurred

## II.  Home-Market Imputed Credit Expenses

The imputed credit expense represents the producer's opportunity cost of extending credit to its customers.  By allowing the purchaser to make payment after the shipment date, the producer forgoes the opportunity to earn interest on an immediate payment.  Thus, the imputed credit expense reflects the loss attributable to the time value of money.  Commerce's usual imputed credit calculation is based only on the cost of financing receivables between shipment date and payment date.  See Mitsubishi, 22 CIT at ___, 15 F. Supp.2d at 820.  In its final determination, Commerce deducted the credit expenses imputed to U.S. sales from CEP and deducted the credit expenses imputed to home-market sales from CV.  See Japan Final at 38,147.  Commerce made the deduction from CV as a circumstance of sale adjustment.  See Remand Determ. at 5; see also 19 U.S.C. § 1677b(a)(6)(C)(iii)(1994).[6]

---

in Japan.  See Cmts. of TKS on Remand Determ. at 14.  Because, based on the record, Commerce reasonably concluded that TKS incurred no home-market indirect selling expenses associated with U.S. economic activity, the Court sustains Commerce's decision on remand not to reduce CEP by the amount of such expenses.

[6]According to the statute, a NV that is based on CV is subject to the same adjustments as NV based on home-market or third-country sales.  19 U.S.C. § 1677b(a)(8).  Commerce describes the imputed credit adjustment as a circumstance of sale adjustment.  See Germany Final at 38,187.  The circumstance of sale adjustment for imputed credit expenses adjusts for differences in the payment terms extended to customers in the U.S. and home markets.  See Engineered Process Gas Turbo-Compressor Systems From Japan, 62 Fed. Reg. 24,394, 24,407 (Dep't Commerce, May 5, 1997)(final determ.).  This Court has held that Commerce's decision to treat the imputed credit expense as a circumstance of sale was reasonable.  See Mitsubishi, 22 CIT at ___, 15 F. Supp.2d at 821.

The statute requires Commerce to include in CV the actual amounts of selling, general, and administrative ("SG&A") expenses incurred by the producer in the home market.  See 19 U.S.C. § 1677b(e)(2)(A)(1994).  Imputed credit expenses are not actual expenses, but rather opportunity costs.  Therefore, prior to making the circumstance of sale adjustment, Commerce did not include imputed credit expenses in the CV calculation for the final determination.  See Japan Final at 38,148.

Because Commerce did not add imputed credit expenses to CV in the first place, Goss argued that Commerce should not have deducted an amount for home-market imputed credit expense from CV as a circumstance of sale.  See Mitsubishi, 22 CIT at ___, 15 F. Supp.2d at 823.  In rebuttal, Commerce explained that the current statute also requires actual profit to be added to CV.  See id. at ___, 15 F. Supp.2d at 824; see also 19 U.S.C. § 1677b(e)(2)(A).  When actual profit is used, Commerce argued, imputed credit is reflected in the profit amount included in CV.  See Mitsubishi, 22 CIT at ___; 15 F. Supp.2d at 824.  The Court, however, could not sustain Commerce's argument because it was a post hoc rationalization advanced by agency counsel.  See id. (citing Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983)).  Therefore, the Court remanded the matter for Commerce to explain its decision on the record.  See id.

On remand, Commerce explained that, "[b]y using the respondent's actual sales revenue and costs to compute CV profit, the CV reflect[ed] a NV unadjusted for imputed credit."  See Remand

Determ. at 6-7.  Therefore, Commerce contended, using an actual amount of profit did not preclude the imputed interest expense adjustment even though NV was based on CV.  See id. at 7 (citing SAA at 831 ("New section [19 U.S.C. § 1677b(a)(8)] ensures continuation of the ability to make appropriate adjustments to constructed value when [constructed value] serves as the basis for normal value.")).

Moreover, Commerce stated that this methodology was consistent with its current practice.  See id. (citing Engineered Process Gas Turbo-Compressor Systems From Japan, 62 Fed. Reg. 24,394, 24,408 (Dep't Commerce, May 5, 1997)(final determ.)(explaining that, while Commerce "would not add an amount for imputed credit expenses in the calculation of CV pursuant to [19 U.S.C. § 1677b(e)(2)(A)], such expenses are reflected in the calculation of CV profit and interest expense"); Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, 62 Fed. Reg. 2,081, 2,119-20 (Dep't Commerce, Jan. 15, 1997)(final results of admin. review)).

Therefore, the issue before the Court is whether it was permissible for Commerce to assume that the actual home-market profit component of CV reflected the opportunity cost of extending credit to customers.  Neither the statute nor its legislative history discusses whether imputed credit expenses are consistent with the CV profit calculation.  Therefore, the Court will defer to Commerce's interpretation so long as it was reasonable.  See Koyo Seiko Co., Ltd. v. United States, 36 F.3d 1565, 1573 (Fed. Cir.

1994)(stating that, where the statute and its legislative history do not clearly indicate Congress's intent, the court will defer to Commerce's reasonable interpretation).

The Court finds that Commerce's decision to deduct imputed credit expenses from CV was reasonable, especially in light of the statute's objective of achieving a fair comparison. See 19 U.S.C. § 1677b(a).

In the face of no counter arguments from Goss, it seems reasonable for Commerce to assume that the Plaintiffs would have sought to recover the opportunity cost of extending credit to their local customers in the home-market price. A forgone activity should be counted as a cost where the firm would have actually engaged in that activity. See STEVEN E. LANDSUBRG, PRICE THEORY AND APPLICATIONS 38 (1995). Accordingly, it seems reasonable to assume that the Plaintiffs would have elected to earn interest had they demanded immediate payments, thereby maximizing revenue. Under this line of reasoning, the producers increase their home-market prices to recover for the opportunity cost of extending credit to their customers. Total revenue is equal to the home-market price multiplied by the total number of home-market sales. The actual profit component of CV is equal to total revenue minus total actual costs. Therefore, a component of the Plaintiffs' actual profit on home-market sales reflects the imputed credit expense.

Indeed, Commerce made the same assumption for U.S. sales in deducting imputed credit expenses from CEP, the U.S. sales price. See Remand Determ. at 5, 7. Thus, Commerce's decision to adjust

both CV and CEP for imputed credit expenses was reasonable in order to ensure a fair comparison.  See 19 U.S.C. § 1677b(a)("a fair comparison shall be made between the export price or constructed export price and normal value"); see also Koyo Seiko, 36 F.3d at 1568 ("To ensure that the quantum of antidumping duties is calculated in a fair manner, both foreign market value and United States price are subject to certain adjustments in order to achieve a common point at which to perform the price comparison.").

Because Commerce's treatment of imputed credit expenses as reflected in CV profit was permissible, the Court sustains Commerce's decision to deduct imputed credit expenses from CV.

## III. The Affiliation of Certain Major Input Suppliers

The statute directs Commerce to examine transactions between "affiliated" companies involving the production by one of such companies of a "major input" to the merchandise produced by the other.  See 19 U.S.C. § 1677b(f)(3)(1994).  Thus, for the purpose of this provision, Commerce must determine whether the producer and supplier are "affiliated."  Under the statute, the following persons, among others, are to be considered affiliated persons: "[a]ny person who controls any other person and such other person." 19 U.S.C. § 1677(33)(G)(1994)(emphasis added).  Moreover, "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."  Id. (emphasis added).  The SAA explains that "[a] company may be in a position to exercise

restraint or direction . . . through . . . close supplier relationships in which the supplier or buyer becomes reliant upon the other."  SAA at 838.

Here, the Court found that Commerce failed to state the basis upon which it determined that certain suppliers of major inputs were affiliated with MHI pursuant to 19 U.S.C. § 1677(33)(G).  See Mitsubishi, 22 CIT at ____, 15 F. Supp.2d at 832.  During its investigation, Commerce had requested that MHI list inputs obtained from suppliers that furnished more than fifty percent of their total annual sales to MHI, yet Commerce stated in its final determination that it "never indicated that this constitute[d] affiliation."  Japan Final at 38,163.  Therefore, the Court remanded this issue for Commerce to reevaluate its determination.  See Mitsubishi, 22 CIT at ___, 15 F. Supp.2d at 832.

On remand, Commerce explained that, "[b]ecause LNPP was one of the first proceedings under the [Uruguay Round Agreements Act,] [Commerce] could only look to the SAA and the Proposed Rules for guidance."[7]  Remand Determ. at 10.  As noted, the SAA indicates that "close supplier relationships" may constitute sufficient control to satisfy 19 U.S.C. § 1677(33)(G), but does not define the term.  See SAA at 838.  Moreover, the Proposed Rules indicate Commerce's intention to develop the URAA definition of "control" on

---

[7]The "Proposed Rules" refer to the regulations Commerce proposed to conform its regulations to the Uruguay Round Agreements Act ("URAA").  See Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7,308 (Dep't Commerce, Feb. 27, 1996)(notice of proposed rulemaking)("Proposed Rules").

a case-by-case basis.  See Proposed Rules at 7,310.

With this background, Commerce explained its methodology for determining whether MHI's suppliers of major inputs were affiliated with MHI within the meaning of 19 U.S.C. § 1677(33)(G):

> In this case, [Commerce] determined that a reasonable reporting parameter for this purpose would be to consider any supplier that depended upon MHI for 50 percent or more of its sales during each year during a five year period to be potentially subject to the restraint or direction of MHI.

Remand Determ. at 10.

Commerce is to be accorded substantial deference in interpreting the antidumping laws.  See Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995)(citing Daewoo Elecs. Co. v. Int'l Union, 6 F.3d 1511, 1516 (Fed. Cir. 1993), cert. denied, 512 U.S. 1204 (1994)).  Therefore, where as here, Congress leaves a term undefined, it is within Commerce's discretion to develop the meaning of the term on a case-by-case basis so long as its application in a given case is reasonable.

The Court finds that the greater-than-fifty-percent-sales-dependence-for-five-years test was a reasonable reporting parameter in this case.  As noted, the SAA states that close supplier relationships may be indicia of "control" under 19 U.S.C. § 1677(33)(G).  See SAA at 838.  Given the existence of a large number of major input suppliers in this case, see Remand Determ. at 10, it was reasonable for Commerce to conclude that a close supplier relationship existed where the supplier depended on MHI for fifty percent or more of its sales during each year of a five

year period.

The proposed rules Commerce cited also state, however, that "[m]ere identification of the presence of one or more of these or other indicia of control does not end our task.  We will examine these indicia, in light of business and economic reality, to determine whether they are, in fact, evidence of control." Proposed Rules at 7,310.  On remand, Commerce explained that,

> [It] considered the standard of 50 percent or greater reliance for each year over a five year period appropriate in this case because: 1) the period of investigation (and therefore the cost reporting period) for MHI was a five-year period; 2) LNPP[s] generally take multiple years to produce; and 3) this degree of reliance over an extended period of time is high for custom-made merchandise.  Under the unique facts of this case, we consider this level of reliance sufficient to presume that such a supplier is affiliated with MHI on the basis of control, within the meaning of [19 U.S.C. § 1677(33)(G)] through a close supplier relationship.

Remand Determ. at 10-11.

The Court finds that substantial evidence supports Commerce's conclusion that a supplier's satisfaction of the greater-than-fifty-percent-sales-dependence-for-five-years test demonstrated affiliation on the basis of control.  The record indicates that the subject LNPPs are highly customized products, requiring unique technical specifications.  See Normal Value Mem. (Conf. Doc. 73)(Nov. 9, 1995) at 3.  Coupled with the fact that LNPPs generally take multiple years to produce, it logically follows that a long term supplier would adjust its manufacturing operations to satisfy the specific demands of its purchaser.  Therefore, it was reasonable for Commerce to conclude that MHI was "legally or

operationally in a position to exercise restraint or direction over" suppliers dependent on MHI for fifty percent or more of their sales over a five year period.

The Court sustains Commerce's determination that certain major input suppliers of MHI were affiliated with MHI within the meaning of 19 U.S.C. § 1677(33)(G) because it was in accordance with law and supported by substantial evidence.

**IV. Commerce's Decision Not to Treat Trading Company and MHI as Affiliated Parties**

The statute defines "affiliated persons" to include "[t]wo or more persons directly or indirectly controlling, controlled by, or under common control with, any person."  19 U.S.C. § 1677(33)(F)(1994).  MLP U.S.A., Inc. ("MLP") is a joint venture between MHI and a trading company ("Trading Company").  In Mitsubishi, Goss argued that, because MHI and Trading Company control a third person (i.e., MLP), MHI and Trading Company must be treated as affiliated persons.  See Mitsubishi, 22 CIT at ___, 15 F. Supp.2d at 832.  Commerce denied that the two parties were affiliated, however, because neither MHI nor Trading Company exercised control over each other.  See id.

The Court held that, contrary to Commerce's interpretation, "[t]he statutory definition of affiliated parties at 19 U.S.C. § 1677(33)(F) does not require that MHI and Trading Company exercise control over each other.  The statute requires only that 'two or more persons[]' control a third person."  See id.  Therefore, the

Court remanded for Commerce to reevaluate its determination as to whether MHI and Trading Company were affiliated.

On remand, Commerce reconsidered its previous decision, stating, "Given the nature of MHI's and the Trading Company's ownership in a third person, [MLP], we conclude that MHI and the Trading Company are affiliated pursuant to [19 U.S.C. § 1677(33)(F)]." Remand Determ. at 12.

MHI now argues that Commerce erroneously concluded that MHI is affiliated with Trading Company on the basis of 19 U.S.C. § 1677(33)(F). See Cmts. of Pl. MHI on Remand Determ. at 6. According to MHI, "The evidence establishes that MHI controls MLP, but there is no evidence in the record that Trading Company, as a minority shareholder, also controls MLP." Id. Therefore, MHI contends that Commerce's conclusion was not supported by substantial evidence.

The Court disagrees. Commerce did not find that MHI and Trading Company were affiliated under § 1677(33)(F) based solely on their common ownership of MLP. In its redetermination, Commerce stated, "The record evidence on the degree to which the Trading Company owned shares in MLP supports a conclusion that it also was 'legally or operationally in a position to exercise restraint or direction' over MLP, as set forth in section [1677(33)(F)]." Remand Determ. at 21 (citing 19 C.F.R. § 351.102(b)(stating that, in defining "affiliated parties," Commerce "will not find that control exists . . . unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the

subject merchandise or foreign like product")).

Substantial evidence supports Commerce's conclusion that Trading Company is "legally or operationally in a position to exercise restraint or direction over" MLP.  19 U.S.C. § 1677(33). Trading Company owned a significant interest in MLP and made substantial loans to MLP.  <u>See</u> MHI Oct. 17, 1995 Response (Conf. Doc. 15) Sec. A, Exh. 17 at 5.  Moreover, the fact that MHI and Trading Company were the only shareholders of MLP and had a history of common ownership in various companies suggests that they worked together in managing MLP.  <u>See</u> Ltr. from Wiley, Rein & Fielding (Conf. Doc. 126)(Feb. 2, 1996) at 8, n.17.

Therefore, the Court sustains Commerce's determination on remand that MHI and Trading Company were affiliated within the meaning of 19 U.S.C. § 1677(33)(F).

In finding on remand that MHI and Trading Company were affiliated, Commerce reviewed whether that new determination affected its previous decision to deduct commissions paid by MHI to Trading Company in connection with the Piedmont sale.  <u>See</u> Remand Determ. at 12-13.  The statute provides for the deduction of certain expenses from CEP, including commissions:

> [T]he price used to establish constructed export price shall also be reduced by-
>
> (1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)--
>
> (A) <u>commissions</u> for selling the subject merchandise in the United States;

> (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;
> (C) any selling expenses that the seller pays on behalf of the purchaser; and
> (D) any selling expenses not deducted under subparagraph (A), (B), or (C)[.]

19 U.S.C. § 1677a(d)(1)(emphasis added).

In its remand determination, Commerce explained,

> In deciding whether to continue to make an adjustment based on the commission, we considered whether, in light of the joint venture relationship, it was appropriate to rely on a commission between these two parties. If the nature of the relationships between the joint venture partners is such that any commission . . . received by the affiliated trading company agent may not be at arm's length, it should be disregarded, like an intra-company transfer. In such cases, [Commerce] would deduct from CEP the actual selling expenses incurred by the trading company pursuant to [19 U.S.C. § 1677a(d)(1)(C) and (D)]. In contrast, where the joint venture partners are otherwise independent of each other, the deduction may appropriately be based on the commission paid pursuant to [19 U.S.C. § 1677a(d)(1)(A)].

Remand Determ. at 13.

This Court has sustained Commerce's practice of treating commissions paid by the producer to an affiliated trading company as an intracompany transfer, rather than as a true commission, where the transfer merely serves as a reimbursement for the affiliated party's actual selling expenses. See Floral Trade Council v. United States, 23 CIT ___, ___, slip op. 99-10 (January 27, 1999) at 10. A decision "not to deduct commissions paid to affiliated [trading companies] is . . . reasonable to the extent that it fulfills the statutory objective of preventing double-counting." Id. at ___, slip op. 99-10 at 10-11 (citing U.S. Steel Group v. United States, 22 CIT ___, ___, 15 F. Supp.2d 892, 905

(1998)(holding that, "if because of the relatedness of the producer and U.S. selling agent expenses represented by the commissions are already accounted for by means of a deduction for selling expenses nominally made under another provision of 19 U.S.C.A. § 1677a(d) . . . , no additional commission deduction need be made."), appeal docketed, No. 99-1342 (Fed. Cir. Feb. 12, 1999)).  Therefore, Commerce's interpretation of the statute in its remand determination was in accordance with law.

On remand, Commerce found that "there [was] no evidence on the record demonstrating that MHI and the Trading Company [had] any corporate relationships outside the joint venture and the agency relationship with respect to the Piedmont sale that would suggest that these parties [did] not operate at arm's length."  Remand Determ. at 13-14.  In other words, because Commerce determined that the commission paid by MHI to Trading Company was at arm's length, and therefore, not an intracompany transfer, Commerce deducted the commission from CEP despite finding the parties to be affiliated under 19 U.S.C. 1677(33)(F) rather than deducting U.S. selling agent expenses.

Commerce based its conclusion of an arm's length transaction on two findings: 1) the absence of a control relationship between MHI and Trading Company, and 2) the nature and terms of the commission itself.  See id. at 14.  As support for its finding of a lack of a control relationship, Commerce referred to its final determination.  See id.  There, Commerce concluded "that the degree of cross-ownership and the level of joint-financing between MHI and

the trading company [were] not significant enough to be indicators of [control.]"  Japan Final at 38,157.

Substantial evidence supports Commerce's findings.  First, concerning cross-ownership, the record indicates that both MHI and Trading Company owned significantly less than five percent of each other's outstanding shares of stock during the period of investigation.[8]  See MHI Supplemental Section A Response (Conf. Doc. 115)(Jan. 18, 1996) at A-29.  Second, the record indicates that MHI and Trading Company did not have financing relationships with each other.  See id. at A-30.  Third, based on the proportions of sales made by MHI through Trading Company as compared to both the total sales made by Trading Company and the total sales made by MHI, Commerce reasonably determined that neither party was dependent on the other.  See Japan Final at 38,157; see also MHI Supplemental Section A Response (Conf. Doc. 115)(Jan. 18, 1996) at A-30.

Moreover, Commerce "reviewed the nature and terms of the commission paid by MHI and the details of the Trading Company's contribution to the transaction, and [found] no evidence that the commission was anything but a transaction negotiated by two parties

_____

[8]The statute states that "[a]ny person directly or indirectly owning . . . 5 percent or more of the outstanding voting stock or shares of any organization and such organization[]" are to be considered affiliated.  19 U.S.C. § 1677(33)(E).  Given that neither MHI nor Trading Company held at least five percent of the other's outstanding stock, it was reasonable for Commerce to treat that evidence as support for the conclusion that neither party was "legally or operationally in a position to exercise restraint or direction over the other[.]" 19 U.S.C. § 1677(33).

acting in their own interests."  Remand Determ. at 14.

Commerce reasonably based its finding of an arm's length commission transaction between MHI and Trading Company on substantial evidence indicating the absence of a control relationship between the two parties, as well as on the nature and terms of the commission itself.[9]  Therefore, the Court sustains Commerce's decision to deduct the commission paid by MHI to Trading Company under 19 U.S.C. § 1677a(d)(1)(A) because it was in accordance with law and supported by substantial evidence.

## V.   Foreign Like Product

"In calculating profit margins for CV, Commerce relied on 19

---

[9]Goss argues that in deducting the commission from CEP, Commerce improperly "departed from its well-established practice[.]" Cmts. of Goss on Remand Determ. at 2.  According to Goss,

> To determine whether the commission is made at arm's length, Commerce's standard practice is to compare the commissions paid to affiliated selling agents with those paid by the respondent to any unaffiliated selling agents in the same market.  If there is no unaffiliated sales agent, Commerce generally compares the commission earned by the affiliated selling agent on sales of merchandise produced by the respondent to commissions earned by the affiliated selling agent on sales of merchandise produced by other unaffiliated sellers or manufacturers.

Id. at 3 (citing LMI-LA Metalli Industriale S.p.A. v. United States, 912 F.2d 455, 459 (Fed. Cir. 1990); Coated Groundwood Paper From Finland, 56 Fed. Reg. 56,363, 56,371-72 (Dep't Commerce, Nov. 4, 1991)(final determ.)).
    The practice Goss refers to, however, is based on Commerce's pre-URAA treatment of commissions.  "Treatment of commissions under the newly amended statute is not identical to that required by the [pre-URAA] statute[.]"  U.S. Steel Group, 22 CIT at ___, 15 F. Supp.2d at 905.

U.S.C. § 1677b(e)(2)(A), which states that CV profit is to be based upon 'the actual amounts incurred and realized by the specific exporter or producer . . . in connection with the production and sale of a <u>foreign like product</u> . . . .'" <u>See</u> <u>Mitsubishi</u>, 22 CIT at ___, 15 F. Supp.2d at 828 (quoting 19 U.S.C. § 1677b(e)(2)(A)(emphasis added)). The statute defines "foreign like product" as,

> [M]erchandise in the first of the following categories in respect of which a determination . . . can be satisfactorily made:
>
> (A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
>
> (B) Merchandise-
>
> (i) produced in the same country and by the same person as the subject merchandise,
> (ii) like that merchandise in component material or materials and in the purposes for which used, and
> (iii) approximately equal in commercial value to that merchandise.
>
> (C) Merchandise-
> (i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
> (ii) like that merchandise in the purposes for which used, and
> (iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16)(1994).

In <u>Mitsubishi</u>, TKS argued that Commerce should not have relied on § 1677b(e)(2)(A) because the findings that led Commerce to rely on CV rather than home-market prices in calculating NV constituted evidence that no foreign like product existed in the home market.

See Mitsubishi, 22 CIT at ___, 15 F. Supp.2d at 828-29.  Because

Commerce did not explain which of the three statutory foreign like

product definitions it relied upon in classifying LNPPs sold in the

home market as foreign like product, the Court remanded this issue

for Commerce's reconsideration.  See id. at ___, 15 F. Supp.2d at

829.

On remand, Commerce explained that it had relied upon the

definition of foreign like product at § 1677(16)(C) in making its

determination.  See Remand Determ. at 17.  Commerce explained its

basis for foreign like product under that section as follows:

> First, the LNPP[s] produced and sold in Japan by TKS
> were: 1) produced in the same country as the merchandise
> subject to the investigation (Japan); 2) produced by the
> same person (TKS); and 3) are of the same general class
> or kind as the merchandise subject to the investigation
> (LNPP).  Second, the LNPP[s] sold in the home market were
> like the subject merchandise (LNPP) sold in the United
> States in the purposes for which they were used; i.e.,
> both LNPP[s] were used to produce newspapers.  Finally,
> . . . home market LNPP[s] may reasonably be compared to
> the subject merchandise (LNPP).  The fact that it was not
> practicable to compare specific models of LNPP[s] is not
> the same as saying that home market LNPP[s] may not
> reasonably be compared with the subject merchandise
> (LNPP).

Id.

Commerce properly explained the statutory basis for its

foreign like product determination in accordance with 19 U.S.C. §

1677(16)(C).[10]  Commerce's application of what "may reasonably be

---

[10]TKS now argues that Commerce's foreign like product
determination was not in accordance with law because "[Commerce]
confused 'foreign like product' with 'the same class or kind' as
the merchandise subject to the investigation[, yet] . . . the two
are distinct categories of merchandise."  Cmts. of TKS on Remand
Determ. at 8.  TKS's argument is without merit.  The statute's

compared" under 19 U.S.C. § 1677(16)(C)(iii) in this case, however, appears inconsistent with its previous interpretation of this requirement. In its remand determination, Commerce explained,

> So as not to unreasonably distort comparisons involving non-identical merchandise, [Commerce] does not compare subject merchandise sold in the United States to merchandise sold in the foreign market where the variable cost of manufacturing of the latter merchandise differs from the variable cost of manufacturing of subject merchandise sold to the United States by more than 20 percent of the total cost of manufacturing of the subject merchandise sold to the United States.

Remand Determ. at 15 (citing Import Administration Policy Bulletin 92.2 (July 29, 1992)).

In the above excerpt, Commerce referred to the difference in merchandise ("difmer") adjustment. Where the foreign like product is not identical to the subject merchandise, Commerce will adjust normal value for the "difference in cost attributable to the difference in physical characteristics" pursuant to 19 U.S.C. § 1677b(a)(6)(C)(ii). Import Administration Policy Bulletin 92.2 (July 29, 1992). Here, then, had Commerce based the home-market price on normal value, the difmer adjustment would have applied because Commerce compared non-identical home-market and U.S. LNPPs.

To determine whether there is a reasonable basis for comparing non-identical merchandise, Commerce applies the twenty percent

---

foreign like product provision is comprised of a hierarchy of three alternative definitions. See 19 U.S.C. § 1677(16). Commerce relied on the third and broadest definition, which covers merchandise "of the same general class or kind as the merchandise which is the subject of the investigation[.]" 19 U.S.C. § 1677(16)(C)(emphasis added). Therefore, Commerce's interpretation of the foreign like product definition was consistent with the plain language of the statute.

difmer guideline.  The policy bulletin Commerce cited in its remand

determination explains as follows:

> To limit the potential differences in commercial value
> caused by physical differences, we employ the 20%
> guideline.  If the commercial value of two products is
> greatly different, then a comparison is not reasonable;
> the difmer adjustment, being limited to variable
> manufacturing costs probably cannot fully compensate. .
> . . When the variable cost difference exceeds 20%, we
> consider that the probable differences in values of the
> items to be compared is so large that <u>they cannot
> reasonably be compared</u>.  Since the merchandise is not
> identical, does not have approximately equal commercial
> value, and has such large differences in commercial value
> that it cannot reasonably be compared, the merchandise
> cannot be considered similar under [§ 1677(16)(A), (B),
> or (C)]. . . .
>
> There may be instances in which comparisons may be
> reasonable even if the diffmer [sic] is in excess of 20%
> of the cost of manufacture of the U.S. model. . . . The
> 20% guideline is, however[,] a point of departure in the
> analysis, and cannot be ignored.  Any use of comparisons
> with greater than 20% diffmers [sic] must be explained.
> . . . Unless we can explain how the comparison remains
> reasonable, or distortion is minimized, we should not
> make comparisons when diffmers [sic] exceed 20%.
> Instead, when there is no other similar merchandise, we
> should revert to constructed value[.]

Import Administration Policy Bulletin 92.2 (July 29, 1992)(emphasis

added).[11]

Thus, where the difmer adjustment would exceed twenty percent,

Commerce cannot make a finding that merchandise is reasonably

comparable, unless it can explain how the comparison nevertheless

---

[11]Although the policy bulletin is dated 1992, Commerce
continues to make the difmer adjustment to NV and employ the
twenty percent difmer guideline under the URAA.  See 19 U.S.C. §
1677b(a)(6)(C)(ii); 19 C.F.R. § 351.411(1998); see also
Antidumping Manual, Ch. 8 at 49-52 (explaining that Commerce uses
the twenty percent difmer guideline to determine whether there is
a reasonable basis for comparing merchandise).

remains reasonable.

Here, it appears Commerce found that the difmer adjustment would exceed the twenty percent guideline. First, as quoted above, Commerce mentioned the twenty percent difmer guideline in its remand determination. See Remand Determ. at 15. Moreover, in its final determination, Commerce stated, "[T]he degree of unique customization for customers made the difference-in-merchandise adjustment for product price matching potentially so complex that the use of CV provided a more reliable and administrable methodology for establishing NV." Japan Final at 38,146. Finally, in its normal value memorandum, Commerce stated,

> [T]he petitioner's arguments fail to resolve the fundamental product comparability problems stemming from differences between the U.S. and Japanese LNPP markets[.] . . . The sheer extent of the physical differences demonstrate that the [petitioner's] proposed matches are between products separated by complex physical differences so numerous that the Department's normal reliance on [difmer] adjustments would become an analytical exercise equivalent to the use of constructive value.

Normal Value Mem. (Conf. Doc. 73)(Nov. 9, 1995) at 16-17.

Because Commerce appears to find that the difmer adjustment would exceed the twenty percent guideline, Commerce cannot conclude that the home-market and U.S. LNPPs "may reasonably be compared" under 19 U.S.C. 1677(16)(C)(iii) without explaining how the merchandise nevertheless remains comparable. See Import Administration Policy Bulletin 92.2 (July 29, 1992). As it stands, Commerce has not explained how the merchandise is still reasonably comparable. Moreover, TKS argues that Commerce's reasonable

comparison finding under subparagraph (iii) of § 1677(16)(C) is not supported by substantial evidence.  See Cmts. of TKS on Remand Determ. at 10.   The Court agrees.

In its remand determination, Commerce stated, "In making fair value comparisons, [Commerce] identifies the 'foreign like product' by comparing the physical characteristics of subject merchandise with the physical characteristics of merchandise sold in the foreign market."  Remand Determ. at 15 (citing Stainless Steel Wire Rod From Spain, 63 Fed. Reg. 40,391, 40,399 (Dep't Commerce, July 29, 1998)(final determ.)).   Here, however, none of the record documents Commerce cited as support for its foreign like product determination indicates that the home-market and U.S. LNPPs were reasonably comparable in terms of their physical characteristics. See Remand Determ. at 24 (citing Normal Value Mem. (Conf. Doc. 73)(Nov. 9, 1995); Prelim. Concurrence Mem. (Conf. Doc. 152)(Feb. 23, 1996) at 10; Japan Final at 38,146-47).

Instead, each document that Commerce cited merely refers to a putative foreign like product, without discussing the factual support for the decision.   For example, in the preliminary concurrence memorandum, Commerce merely stated, "[W]e have determined that the foreign like product consists of all LNPPs, additions, and components sold by the Plaintiffs in their respective home markets[.]"  Prelim. Concurrence Mem. (Conf. Doc. 152)(Feb. 23, 1996) at 10.  Moreover, rather than mention a single physical similarity, the bulk of the normal value memorandum discusses all the physical dissimilarities between home-market and

U.S. LNPPs.  See Normal Value Mem. (Conf. Doc. 73)(Nov. 9, 1995) at 6-17.  The Court cannot review Commerce's foreign like product finding without an explanation of the decision's factual basis. See SEC v. Chenery Corp., 318 U.S. 80, 94 (1943).[12]

The Court cannot sustain Commerce's foreign like product determination.  The Court remands this issue for Commerce's reconsideration consistent with this Court's opinion.  On remand, Commerce may either explain how the Japanese and U.S. LNPPs are reasonably comparable notwithstanding the twenty percent difmer guideline or find that no foreign like product exists.  In addition, Commerce must establish that substantial record evidence demonstrates physical similarities Commerce for determining that a fair value comparison between Japanese and U.S. LNPPs can be made.

---

[12]Commerce also cited certain questionnaire responses as admissions by TKS that it considered its home-market LNPPs to be a foreign like product.  See Remand Determ. at 16 (citing TKS Sept. 27, 1995 Response (Conf. Doc. 15) Sec. A at A-7, A-8).  In its brief, Commerce states that it "reasonably treated TKS's own admissions as relevant to . . . whether LNPPs from Japan could reasonably be compared with LNPPs from the United States." Def.'s Br. at 17.  The Court disagrees with Commerce's characterization of TKS's questionnaire responses as "admissions."  Upon reviewing TKS's statements, one could not reasonably conclude that TKS was conceding that its home-market LNPPs constituted a foreign like product.  See TKS Sept. 27, 1995 Response (Conf. Doc. 15) Sec. A at A-5 to A-12.  To the contrary, TKS's statements unambiguously express TKS's position that "there is no reasonable basis for comparison of the sales of LNPP additions by TKS in the United States and Japan."  Id. at A-7. Therefore, TKS's section A questionnaire responses do not constitute substantial evidence for Commerce's foreign like product determination.

## Conclusion

For the reasons set out above, Commerce's remand determination in Large Newspaper Printing Presses from Japan is remanded for Commerce to reconsider and explain its foreign like product determination in accordance with this Court's opinion.  Commerce's remand determination is sustained in all other respects.  Commerce shall complete its remand determination by Monday, July 26, 1999; any comments or responses are due by Wednesday, August 25, 1999; and any rebuttal comments are due by Thursday, September 9, 1999.

So Ordered.

_____
Donald C. Pogue
Judge

Dated:    May 26, 1999
          New York, New York