334 F.3d 1033
 AMERICAN SILICON TECHNOLOGIES and SKW Metals & Alloys, Inc., Plaintiffs, and
Elkem Metals Company and Globe Metallurgical, Inc., Plaintiffs-Appellees,
v.
UNITED STATES, Defendant-Appellee, and
Companhia Brasileira Carbureto de Calcio, Defendant-Appellant, and
Companhia Ferroligas Minas Gerias-Minasligas and Rima Industrial S/A, Defendants.
 No. 02-1033.
 United States Court of Appeals, Federal Circuit.
 DECIDED: July 3, 2003.
 
 Martin Schaefermeier, Verner, Liipfert, Bernhard Mcpherson and Hand, Chartered, of Washington, DC, argued for plaintiffs-appellees. With him on the brief was William D. Kramer.
 Reginald T. Blades, Jr., Senior Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; and David M. Cohen, Director. Of counsel on the brief were John D. McInerney, Chief Counsel for Import Administration; Elizabeth C. Seastrum, Senior Counsel; and John F. Koeppen, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.
 Philippe M. Bruno, Dorsey & Whitney LLP, of Washington, DC, argued for defendant-appellant. Of counsel was Rosa S. Jeong.
 Before MICHEL, RADER, and PROST, Circuit Judges.
 RADER, Circuit Judge.
 
 
 1
 In this silicon metal antidumping case, the United States Department of Commerce (Commerce) initially assessed the dumper's financial costs using the consolidated financial statements of its ultimate Belgian parent. The United States Court of International Trade remanded the case to Commerce with instructions to recalculate the dumping company's financial costs by examining the records of only its immediate Brazilian parent. Because the Court of International Trade did not allow Commerce to examine the entire record to determine financial costs, this court reverses.
 
 I.
 
 2
 In 1991, Commerce found that Companhia Brasileira Carbureto de Calcio (CBCC), a Brazilian producer and exporter of silicon metal, had dumped its product in the United States. Commerce then undertook to determine a duty under 19 U.S.C. § 1675(a)(2)(A). Accordingly, Commerce examined silicon metal entering from Brazil for the period from July 1, 1994 to June 30, 1995. During its review, Commerce learned that Solvay do Brasil (Brasil) owns 99.9% of CBCC. Moreover, Solvay & Cie of Belgium (Solvay) owns 100% of Brasil, CBCC's parent. Thus, in computing CBCC's finance costs — a key component of the dumping margin — Commerce determined that Belgian Solvay was the ultimate parent corporation of CBCC.
 
 
 3
 Because Commerce found that Belgian Solvay was CBCC's ultimate parent, Commerce used Solvay's 1994 consolidated financial statements to set CBCC's dumping margin. A financial expense ratio figured from these statements became a key component for calculating the cost of production and the value of the silicon metal sold by CBCC in the United States during the review period. See Silicon Metal from Brazil, Amended Final Results of Antidumping Administrative Review, 62 Fed. Reg. 54,087 (Oct. 17, 1997); Silicon Metal from Brazil; Final Results of Antidumping Administrative Review and Determination Not to Revoke in Part, 62 Fed. Reg. 1970 (Jan. 14, 1997). Using the financial expense ratio calculated with the Belgian figures, Commerce issued a dumping margin for CBCC.
 
 
 4
 American Silicon Technologies, SKW Metal & Alloys, Inc., Elkem Metal Co., and Globe Metallurgical, Inc. (collectively, American Silicon), petitioners in Commerce's administrative review, disagreed with Commerce's calculation of CBCC's financial expense ratio. Instead, American Silicon reasoned, Commerce should employ the combined financial expenses of CBCC and its immediate parent, Brasil. American Silicon based this reasoning on record evidence of inter-company financial transactions between CBCC and Brasil, such as loans and stock transfers. Moreover, American Silicon argued that Brazilian companies ordinarily borrow within domestic credit markets or from Brazilian banks, as opposed to seeking credit from external markets. By calculating CBCC's financial expense ratio using Solvay's consolidated financial statements, American Silicon contended that Commerce inappropriately shifted costs of production away from the subject merchandise.
 
 
 5
 Commerce's standard policy for assessing finance costs bases interest expenses and income on fully consolidated financial statements because the cost of capital is fungible. According to Commerce, consolidated financial statements indicate that a corporate parent controls a subsidiary. Indeed, market analysts use consolidated statements to fairly represent the financial health of parent companies with substantial subsidiary operations. Therefore, under standard Commerce policy as well as standard accounting principles, "majority ownership is prima facie evidence of control over the subsidiary." Am. Silicon Techs. v. United States, Consol. Court, No. 97-02-00267, slip op. 99-34, 1999 WL 354415 (Ct. Int'l Trade Apr. 9, 1999). Moreover, the Court of International Trade has sustained Commerce's normal practice in calculating financial expense ratios as a permissible interpretation of applicable statutes (19 U.S.C. §§ 1677b(b)(3)(B) (2000), 1677b(e)(2)(A) (2000), and 1677b(f)(1)(A) (2000)), the Statement of Administrative Action, and its case law. See, e.g., Gulf States Tube Div. of Quanex Corp. v. United States, 981 F.Supp. 630, 647-49 (Ct. Int'l Trade 1997).
 
 
 6
 Therefore, Commerce initially determined Solvay had the power to direct the capital structure of CBCC with its controlling interest. Because Solvay is the ultimate parent of the Solvay corporate group and controls CBCC's financial expenses, Commerce and CBCC relied on Solvay's consolidated financial statements to calculate CBCC's financial expenses.
 
 
 7
 American Silicon appealed to the Court of International Trade. The Court of International Trade determined that Commerce erred in employing the consolidated financial statements of Solvay when calculating CBCC's financial expense ratio. Am. Silicon, 1999 WL 354415, at *8. In support of that finding, the Court of International Trade noted that Brasil engaged in financing with CBCC, while no direct financial exchanges occurred between CBCC and Solvay during the relevant period. Id. The Court of International Trade did not assess whether Belgian Solvay controlled and accounted for Brasil's financial transactions with CBCC in the relationships of its subsidiaries. Nonetheless, the Court of International Trade deviated from the normal rule and determined that, in this case at least, the ultimate parent's financial statements did not reasonably reflect "the actual cost incurred by CBCC to produce and sell silicon metal." Id. at *7; see also 19 U.S.C. § 1677b(f)(1)(A).
 
 
 8
 The trial court remanded to Commerce with instructions to recalculate CBCC's financial expense ratio utilizing the consolidated financial statements of CBCC and its immediate parent company, Brasil, excluding any financial information from Belgian Solvay, the ultimate parent of both Brasil and CBCC. Following the remand, Commerce reluctantly recalculated CBCC's financial expense ratio, asserting in its final remand results the continued belief that the initial calculation was appropriate. The Court of International Trade disagreed and sustained the remand results. Am. Silicon Techs. v. United States, Consol. Court No. 97-02-00267, slip op. 01-109, 2001 WL 1223714 (Ct. Int'l Trade Aug. 27, 2001). CBCC appeals, asserting error by the Court of International Trade in denying Commerce sufficient deference in its initial calculation of CBCC's financial expense ratio based on the consolidated financial statements of its ultimate parent, Belgian Solvay.
 
 II.
 
 9
 The Court of International Trade reviews final decisions of Commerce for "substantial evidence on the record" and consistency "with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000). This court has jurisdiction under 28 U.S.C. § 1295(a)(5) to review final decisions of the Court of International Trade.
 
 
 10
 This court reviews anew decisions of the Court of International Trade applying the same statutory standard as the trial court. Mitsubishi Heavy Indus., Ltd. v. United States, 275 F.3d 1056, 1060 (Fed.Cir.2001); F.LLI De Cecco Di Flippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1031 (Fed.Cir.2000). Thus, without affording any deference to the Court of International Trade, this court reassesses the administrative record for "substantial evidence" and for consistency "with law." 19 U.S.C. § 1516a(b)(1)(B)(i); Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1559 (Fed.Cir.1984); see also Zenith Elecs. Corp. v. United States, 99 F.3d 1576 (Fed.Cir.1996); Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 982-83 n. 1 (Fed.Cir.1994); Am. Permac, Inc. v. United States, 831 F.2d 269, 274-76 (Fed.Cir.1987); Matsushita Elec. Indus. Co. v. United States, 750 F.2d, 927, 933-36 (Fed.Cir.1984). Thus, this court must review the entire record for substantial evidence and compliance with law. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951); see also Mitsubishi Heavy Indus., Ltd., 275 F.3d at 1060. Commerce's determination may be supported by substantial evidence of record "[e]ven if it is possible to draw two inconsistent conclusions from evidence in the record." Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed.Cir.2001) (citing Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1044 (Fed.Cir.1996)). In view of the record as a whole, the reviewing court must consider supporting evidence as well as that which "fairly detracts from its weight." Universal Camera, 340 U.S. at 478, 481, 488, 71 S.Ct. 456. A review of the entire administrative record puts before this court both the trial court's remand order instructing Commerce to calculate CBCC's interest expenses without reference to its ultimate parent and the trial court's acceptance of that specifically limited dumping calculation.
 
 
 11
 To calculate cost of production, title 19 requires Commerce to include "an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product." 19 U.S.C. § 1677b(b)(3)(B). Similarly, a calculation of constructed value requires Commerce to add "the actual amounts incurred and realized by the specific exporter ... for selling, general, and administrative expenses in connection with the production and sale of the foreign like product." 19 U.S.C. § 1677b(e)(2)(A). Title 19 also counsels Commerce to calculate costs "normally ... based on the records of the exporter" where those records "reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). The same section requires Commerce, however, to "consider all available evidence on the proper allocation of costs." Id. Title 19 provides no further guidance on calculation of financial expenses. In particular, title 19 does not suggest any calculation method for an exporter that is wholly owned or controlled by a parent company. Because the statute provides no specific guidance, Commerce enjoys broad discretion to devise a method for calculating "general expenses." Micron Tech. Inc. v. United States, 243 F.3d 1301, 1308 (Fed.Cir.2001).
 
 
 12
 This court must therefore determine whether Commerce reasonably calculated "general expenses" by using Solvay's consolidated financial documents. In the first place, this court notes that standard accounting principles acknowledge consolidated financial statements as a fair presentation of the financial position of a group. See, Floyd A. Beams, Advanced Accounting 74, 77, 91, 102-03 (5th ed. 1992). Following those practices, Commerce has adopted and followed a standard policy for assessing finance costs of a producer based on the consolidated financial statements of a parent because the cost of capital is fungible. Commerce's policy recognizes that consolidated financial statements indicate that a corporate parent controls a subsidiary. These consolidated statements represent the financial health of parent company operations in view of subsidiary operations. In addition, fungible financial assets invite manipulation. In other words, if Commerce used only a single division of a group as the source of financing costs, the controlling entity could shift borrowings from one division to another to defeat accurate accounting.
 
 
 13
 Therefore, under standard Commerce policy, as well as standard accounting principles, "majority ownership is prima facie evidence of control over the subsidiary." Am. Silicon, 1999 WL 354415, at *7. Moreover, the Court of International Trade has sustained Commerce's normal practice of calculating financial expense ratios based on the consolidated financial statements of a parent as a permissible interpretation of applicable statutes (19 U.S.C. §§ 1677b(b)(3)(B), 1677b(e)(2)(A), and 1677b(f)(1)(A)), the Statement of Administrative Action, and its case law. See, e.g., Gulf States Tube, 981 F.Supp. at 647-49.
 
 
 14
 As a legal matter, the Court of International Trade had an obligation to defer to Commerce's reasonable methodology in the first place, but no such deference was afforded. Thus, according proper deference, Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570, 1575 (Fed.Cir.1994), this court sustains as reasonable Commerce's well established practice of basing interest expenses and income on fully consolidated financial statements.
 
 
 15
 In its initial review, Commerce considered the facts of record and, after analyzing indicia of parental control over subsidiary CBCC, determined the consolidated financial statements of Solvay were appropriate for calculating CBCC's financial expense ratio. In reaching this initial decision, Commerce relied heavily upon the capability of the ultimate parent company, Solvay, to determine the capital structure of its subsidiary, CBCC. Commerce found that the majority equity ownership of CBCC by Solvay is prima facie evidence of control over CBCC. Commerce, however, ended its inquiry here without examining the entire record to determine whether this presumption has been overcome or whether Solvay's financial statements accurately reflect the actual costs associated with the production of the subject merchandise. The Court of International Trade misapplied the substantial evidence standard when it required Commerce to recalculate the financial costs based on CBCC's transactions solely with Brasil. The trial court concluded that Brasil "would be much more likely to have and exercise direct control over the subsidiary." Am. Silicon, 1999 WL 354415, at *8. The trial court based this conclusion on its reading of the record that Brasil and CBCC interact more financially than Solvay and CBCC or Solvay and Brasil.
 
 
 16
 In the first place, the trial court's analysis deviates from Commerce's well-established practice of acknowledging the role of consolidated statements. Instead, the trial court imposed a requirement of adequate inter-company financial transactions. Specifically, the Court of International Trade noted that Brasil engaged in financing with CBCC with fewer, if any, direct financial exchanges between CBCC and Solvay during the relevant period. The Court of International Trade, however, did not account for whether Belgian Solvay controlled and accounted for Brasil's financial transactions with CBCC in the relationships of its subsidiaries. If finance expenses in a dumping margin calculation depended on assessing inter-company financial transactions, as the trial court seemed to require, the new kind of test would impose significant new administrative burdens on Commerce and invite potential manipulation. The manipulation of this test might take the form of a controlling company selecting a financial cost ratio by directing one of its subsidiaries with a low ratio to lend to the exporter.
 
 
 17
 Further, notwithstanding that the trial court remanded to Commerce, that remand foreclosed Commerce from undertaking a complete analysis. Instead, on remand, the trial court limited Commerce's examination to CBCC's transactions with Brasil. This order prevented Commerce from further assessing the relationship between Brasil and Solvay or CBCC and Solvay. This limit on the remand methodology further inhibited Commerce's ability to ensure an accurate assessment of CBCC's financial costs. As Commerce notes on appeal, during the remand proceedings, Commerce gathered more information about the relationship between CBCC and Brasil, but not with regard to the relationship between CBCC or Brasil and Solvay. Thus, the record in the remand is deficient because Commerce could not compare the consolidated statements of Solvay with the consolidated statements of Brasil. By sharply limiting Commerce's inquiry, the trial court's remand actually prevented Commerce from undertaking a fully balanced examination that might have produced more accurate results.
 
 
 18
 Therefore, this court reverses and remands with instructions to require Commerce to carry out its statutory duty of accurately assessing "general costs" consistent with this opinion.
 
 COSTS
 
 19
 Each party shall bear its own costs.
 
 
 20
 
 REVERSED and REMANDED.
 
 
 
 21
 MICHEL, Circuit Judge, dissenting.
 
 
 22
 I would affirm the decision of the Court of International Trade sustaining the Department of Commerce's ("Commerce") remand result in which the financial expense ratio[1] of the exporter, Companhia Brasileira Carbureto de Calcio ("CBCC"), was calculated based on the combined financial statements of CBCC and its immediate parent, Solvay do Brasil ("Brasil"). In so holding, I would not disturb Commerce's established practice of using an ultimate parent company's fully consolidated financial statement to determine financial expenses of a subsidiary in cases with facts different from this one.[2]
 
 
 23
 The ultimate issue for Commerce to determine is the exporter's actual costs of production and sale of the subject merchandise.[3] Commerce is obligated to rely upon methodologies that "reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f) (2000). In calculating cost of production, Commerce must include "an amount for selling, general, and administrative expenses based on actual data pertaining to production and sales of the foreign like product by the exporter in question." Id. § 1677b(b)(3). Here, the issue principally concerns one of the general expenses, financial expenses, i.e., the interest expenses on loans. The record in this case shows substantial control by Brasil over CBCC's financial expenses. However, there is no evidence, much less substantial evidence, that CBCC's financial expenses pertaining to production and sale of silicon metal were controlled by or are accurately reflected in the consolidated financial statement of Solvay & Cie ("Solvay"), CBCC's ultimate corporate parent. Thus, I agree with the trial court that actual financial costs incurred by CBCC are better derived by combining the financial expense ratios based on the statements of CBCC and Brasil rather than reviewing only the consolidated financial statement of Solvay.[4]
 
 
 24
 As verified by Commerce, Solvay is a Belgian conglomerate of over 400 companies.[5] Solvay does business on five continents with subsidiaries and affiliates in the automotive, chemical, pharmaceutical, plastics, processing, shipping, and related industries. Solvay owns 100% of Brasil, which in turn owns 99.9% of CBCC. CBCC acknowledges that it is the only producer of silicon metal in the Solvay group.
 
 
 25
 Brasil is the Brazilian parent of CBCC. Commerce's CBCC Verification Report of July 22, 1996, shows substantial interactions between Brasil and CBCC on financing during the period of review. Brasil listed CBCC as a source of financial receipts and expenses, and CBCC stated that the difference between its financial income and financial expenses was compensated by loans between Brasil and CBCC, and demonstrated that fact to Commerce verifiers. In addition, the president of the board of directors and administration counsel of Brasil is also the president of the board of directors of CBCC. Furthermore, Commerce found in prior segments of the antidumping duty proceeding on silicon metal from Brazil that Brasil had made a loan to CBCC to finance furnaces to be used to produce silicon metal and that subsequently, "[i]n order to extinguish its outstanding debt, CBCC issued new shares of capital stock to its parent company, [Brasil]."[6] Further, Commerce then noted that CBCC and Brasil relied on "intercompany interest-free borrowing to meet their working capital requirements."[7]
 
 
 26
 On the other hand, there is no evidence in the record showing loans or any other inter-company financial transactions directly between CBCC and Solvay or between CBCC and any Solvay subsidiary other than Brasil. In addition, after Commerce published its Preliminary Results, plaintiffs in this case argued that Brazilian firms normally would borrow in Brazilian credit markets or from Brazilian banks. During the rest of the course of this case (i.e., before Commerce, which published its Final Result after the Preliminary Results, twice before the trial court, and now before us), CBCC has not cited any evidence to refute or even directly address plaintiffs' arguments. CBCC supports its position solely with one fact: the undisputed majority equity ownership by Solvay of CBCC via Brasil.[8]
 
 
 27
 Majority equity ownership, however, does not necessarily lead to the conclusion that the consolidated financial statement of the ultimate parent company reflects the exporter's actual costs of capital. Even the majority disagrees with CBCC's argument for reliance solely on majority equity ownership; otherwise it would simply reverse rather than remand the case to Commerce. Admittedly, Commerce has discretion in determining which consolidated financial statement(s) within the corporate group should be used, or, whether to use any consolidated financial statement at all. However, this discretion is bound by the statutory requirement that it use methodologies that reasonably reflect the actual financial and other expenses associated with the production and sale of the subject merchandise.
 
 
 28
 According to the general provisions regarding antidumping duties, "[c]osts shall normally be calculated based on the records of the exporter or producer of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). Further, the Statement of Administrative Action ("SAA") provides: "if Commerce determines that costs, including financing costs, have been shifted away from production of the subject merchandise, or the foreign like product, it will adjust costs appropriately, to ensure they are not artificially reduced."[9] Here, in view of the existence of loans between CBCC and Brasil during the period of review, Commerce, on remand from the trial court, correctly calculated CBCC's financial expenses by combining the financial expense ratios of CBCC and Brasil. Additionally, in view of the absence of such financial transactions between CBCC and Solvay, it would be a gross and artificial reduction of CBCC's financial expenses to use Solvay's expense ratio, a mere one-sixth of that calculated from CBCC's and Brasil's statements. CBCC has not provided any evidence to justify such a reduction. In any event, such reduction of actual costs is prohibited by relevant statute and the SAA.
 
 
 29
 The majority does not provide any guidance as to what new evidence Commerce should be gathering and reviewing on remand to reach a more accurate calculation. Nor has it identified what new analysis of the evidence already in the record is required. It is not disputed that Solvay is a European conglomerate of hundreds of subsidiaries and affiliates that, on the record and as verified by Commerce, has no direct financial dealings with CBCC. Brasil, on the other hand, is not only the Brazilian parent company of CBCC, but also has made loans to CBCC. Although the existence of such financial transactions may not always be determinative of whether to use the statement of the ultimate parent, in the present case, the existence of such transactions with Brasil and the absence of such transactions with Solvay establish that Brasil exerted actual control over CBCC's finances while Solvay did not. The potential for manipulation by Solvay that the majority describes is negated by the established absence of loans or debt-equity swaps between Solvay and CBCC and the absence of loans to CBCC by any Solvay subsidiary other than Brasil.[10] Commerce does not need to search again the "entire record." It is indeed based on the existence and the absence of such financial evidence that Commerce now seeks affirmance of the trial court's remand and final orders.
 
 
 30
 Given the undisputed facts of record, I agree with the trial court that the combined financial statements of CBCC (the company that produced, sold, and exported the subject metal during the period of review) and Brasil (the company that engaged in favorable intercompany loans with CBCC) better reflect the actual financial expenses pertaining to CBCC's production and sale of silicon metal than the consolidated financial statement of Solvay alone. Solvay's consolidated statement melds financing costs of its over 400 worldwide subsidiaries, all engaging in businesses other than silicon metal production and sale. The use of Solvay's consolidated statement would artificially reduce the actual financial expense ratio of CBCC. Such use is a drastic deviation from the requirement that expense calculation should be "based on actual data pertaining to production and sales of the foreign like product by the exporter in question." 19 U.S.C. § 1677b(b)(3) (emphases added).
 
 
 31
 I note that the trial court's remand decision depended on the specific facts and circumstances of this particular case. As the contrary evidence is so clear here, no substantial evidence supports Commerce's use of Solvay's consolidated financial statement to calculate CBCC's actual financial expenses pertaining to production and sale of silicon metal. Although I agree we owe Commerce deference, here Commerce abused its discretion in relying only on Solvay's financial statement. Hence, I would affirm the decision appealed and also uphold the trial court's remand order.
 
 
 
 Notes:
 
 
 [1]
 A financial expense ratio is used by Commerce for calculating financial expenses, and is normally determined from dividing annual financial expenses by annual cost of goods sold as reflected in audited financial statements
 
 
 [2]
 Commerce's practice is based on the notion that a parent company's majority equity ownership is prima facie evidence of corporate control over a subsidiary, and with corporate control comes the power to control the capital structure of a subsidiary and to manipulate its financial expenses by granting, or requiring other subsidiaries to grant, the exporter loans on favorable terms. In this case, although there is evidence showing actual exercise of such control by the immediate parent company, evidence of actual exercise of control by the ultimate parent is absent
 
 
 [3]
 In its administrative reviews, Commerce first compares an exporter's home market sales price with its cost of production ("COP"). If the home market sales are at prices above COP, Commerce, in its antidumping margin calculations, compares the price of each U.S. sale of subject merchandise to the weighted-average price for the exporter's contemporaneous home market sales. If no such home market sales are at prices above COP, Commerce compares the price of each U.S. sale to a weighted average constructed value, which is COP plus profit, for the margin calculation. Thus, COP is essential to Commerce's antidumping determination
 
 
 [4]
 I note that this appeal does not present a question of searching for a financial statement not yet in the record. Rather, it presents the question of which of two alternative sets of statements to use: the parent's (Brasil) consolidated statement plus CBCC's, or the consolidated statement of the grandparent (Solvay). The financial statement of CBCC, consolidated financial statement of Brasil, and that of Solvay are all in record and were examined by Commerce at one point or another in these proceedings
 
 
 [5]
 Plaintiffs-appellees Elkem Metals Company and Globe Metallurgical, Inc. state in their brief that Solvay owns more than 180 subsidiary and affiliated companies. The discrepancy between some 180 subsidiaries and 400 was not explained
 
 
 [6]
 Silicon Metal From Brazil, Final Results of Antidumping Duty Administrative Review, 59 Fed. Reg. 42,806, 42,807 (1994)
 
 
 [7]
 Ferrosilicon from Brazil, 59 Fed. Reg. 732, 737 (1994) (emphasis added)
 
 
 [8]
 The second time before the trial court, CBCC also stated that an individual held a senior management position simultaneously in Solvay, Brasil, and CBCC, and that Solvay consolidated CBCC on its 1995 financial statement. The trial court found neither of these facts demonstrated actual control of CBCC's capital structure or borrowing by SolvayAmerican Silicon, 2001 WL 1223714, at *3. I agree.
 
 
 [9]
 Agreement on implementation of Article VII of the General Agreement on Tariffs and Trade (relating to antidumping), Statement of Administrative Action, H.R. Rep. No. 103-826, at 835 (1994),reprinted in 1994 U.S.C.C.A.N. 4040, 4172.
 
 
 [10]
 The majority seems to believe that Commerce had never had a chance to read the financial statements of CBCC simply because the trial court later ordered Commerce to use the combined financial statements of Brasil and CBCC. To the contrary, Commerce verified in 1996 the relationship of CBCC, Brasil, and Solvay, the intercompany transactions between CBCC and Brasil, and the lack of such transactions between CBCC and Solvay. In addition, transactions between CBCC and Solvay or Solvay's other subsidiaries would be shown as entries on CBCC's financial records, which Commerce relied on for part of its calculation of expense ratio. Moreover, if such entries do exist but were not noticed by Commerce, it is most implausible that CBCC has not brought them to light during Commerce's administrative review after plaintiffs' complaint, and in the course of this case, even though it mentioned other new evidence before the trial court (footnote 8,supra).