**Slip Op. 08-33**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
                                                :
GLOBE METALLURGICAL INC.,                       :
                                                :
                 Plaintiff,                     :
                                                :
                                                :    Court No. 07-00011
                                                :
UNITED STATES,                                  :
                                                :
                 Defendant,                     :
                                                :
                 and                            :
LIGAS DE ALUMINIO S.A. and                      :
COMPANHIA FERROLIGAS MINAS                       :
GERAIS-MINASLIGAS,                              :
                                                :
                 Defendant-Intervenors.         :
                                                :
_____:


        Held: Plaintiff's Motion for Judgment Upon the Agency Record
is denied. The United States International Trade Commission's
determination is affirmed.  Case dismissed.


        DLA Piper US LLP (William D. Kramer, and Clifford E. Stevens,
Jr.), for Globe Metallurgical Inc., plaintiff.

        James M. Lyons, General Counsel; Andrea C. Casson, Assistant
General Counsel, Office of the General Counsel, United States
International Trade Commission (Rhonda M. Hughes), for the United
States, defendant.

        Bryan Cave LLP (Lyle B. Vander Schaaf and Joseph Heckendorn),
for Ligas de Aluminio S.A. and Companhia Ferroligas Minas Gerais-
Minasligas, defendant-intervenors.

                                        Dated: March 19, 2008

## OPINION

**TSOUCALAS, Senior Judge:** This matter is before the Court on a motion for judgment upon the agency record brought by Plaintiff Globe Metallurgical Inc. ("Globe" or "Plaintiff") pursuant to USCIT Rule 56.2.

Plaintiff challenges the U.S. International Trade Commission's ("ITC" or "Commission") second sunset review determination concerning the antidumping duty order on silicon metal from Brazil. See Silicon Metal From Brazil and China, 71 Fed. Reg. 71,554 (December 11, 2006). Globe argues that the ITC's determination is unsupported by substantial evidence and otherwise contrary to law. Pl.'s Mot. J. Agency R. ("Globe Brief").[1] For the reasons set forth below, Globe's motion for judgment upon the agency record is denied and the ITC's determination is affirmed.

### JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I) and B(iii).

### STANDARD OF REVIEW

When reviewing the final results in antidumping administrative

---

[1] Unless otherwise noted the reference to all documents herein shall refer to the public version of those documents.

reviews "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is more than a mere scintilla." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Consol. Edison Co., 305 U.S. at 229). In determining the existence of substantial evidence, a reviewing court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" Huaiyin, 322 F.3d at 1374 (quoting Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

The United States Court of Appeals for the Federal Circuit has stated that "in the hierarchy of the four most common standards of review, substantial evidence is the second most deferential, and can be translated roughly to mean is [the determination] unreasonable?" See Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (internal citation and quotations omitted) (alteration in original). Globe, therefore, in challenging the ITC's determination under the substantial evidence standard, "has chosen a course with a high barrier to reversal."

Mitsubishi Heavy Indus., Ltd. v. United States, 275 F.3d 1056, 1060 (Fed. Cir. 2001).  The ITC's determination is "presumed to be correct," and the burden of demonstrating otherwise rests upon the party challenging the determination.   28 U.S.C. § 2639(a)(1).

**ABBREVIATED BACKGROUND**

On July 24, 1991, the ITC determined that an industry in the U.S. was being materially injured by reason of less than fair value imports of silicon metal from Brazil. On July 31, 1991, the Department of Commerce issued an antidumping duty order on subject imports of silicon metal from Brazil.

In January 2001, the ITC, in the first five-year review of the order, determined that revocation of the antidumping duty order  on subject imports of silicon metal from Brazil would be likely to lead to continuation or recurrence of material injury to the domestic industry within a reasonably foreseeable time.   On February 16, 2001, Commerce published a notice of continuation of the antidumping duty order on subject imports of silicon metal from Brazil.  Commerce revoked the antidumping duty order with respect to Brazilian producer Rima Industrial SA, effective July 1, 2001, and with respect to Brazilian producer Companhia Brasileira Carbureto De Calcio ("CBCC") effective July 1, 2002.

On January 3, 2006, the ITC instituted this five-year review to determine whether revocation of the antidumping duty order on

the remaining subject silicon metal from Brazil would likely lead to continuation or recurrence of material injury.[2]

The ITC's final determination was issued on December 6, 2006 and published on December 11, 2006. See Silicon Metal From Brazil and China, 71 Fed. Reg. 71,554 (the "ITC Determination"). The ITC, in a unanimous decision by all participating Commissioners,[3] determined that "revocation of the antidumping duty order covering silicon metal from Brazil would not be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time." Views of the Commission (December 2006)("Views of the Commission") at 3.

Globe argues that the ITC's Determination is unsupported by substantial evidence and otherwise contrary to law. See Globe Brief. Specifically, Globe takes issue with the ITC's finding that (i) if the order were revoked the likely volume of silicon metal imports from Brazil into the U.S. would not be significant; (ii) revocation of the order would not likely lead to significant adverse price effects; and (iii) there would not likely be a significant adverse impact on the domestic industry upon revocation

---

[2] The ITC and the Department of Commerce are required to conduct sunset reviews five years after publication of an antidumping duty order or a prior sunset review. 19 U.S.C. § 1675(c)(1). This review also considered silicon metal from China but that portion of the review is not relevant here.

[3] Commissioner Okun did not participate in this review.

of the order. <u>See</u> Globe Brief at 15-32; Views of the Commission at 16, 19 and 22.

## DISCUSSION

### I. Statutory Framework

When conducting a five-year sunset review under 19 U.S.C. § 1675(c) the ITC shall determine whether revocation of an order would be likely to lead to continuation or recurrence of material injury to the domestic industry within a reasonably foreseeable time.[4]   In making that determination the ITC must consider the likely volume, price effect and impact of imports of the subject merchandise on the industry if the order is revoked.  <u>See</u> 19 U.S.C. § 1675a(a)1.

### II. The ITC's Finding With Respect To Volume Is Supported By Substantial Evidence And Otherwise in Accordance With Law

As described <u>supra</u>, in making a sunset review determination the ITC must consider "the likely volume, price effect and impact of imports of the subject merchandise on the industry if the order is revoked." § 1675a(a)(1). Although the Views of the Commission discussed each of these three considerations in detail, the substance of Globe's arguments are founded on the premise that the

---

[4]  This Court has found "likely" to mean "probable" within the context of §§ 1675(c) and 1675a(a).  <u>See, e.g.</u>, <u>Siderca S.A.I.C. v. United States</u>, 391 F.Supp. 2d 1353, 1356–57 (2005); <u>Usinor Industeel, S.A. v. United States</u>, 26 CIT 1402, 1403-04 (2002).

ITC's "likely volume" findings are erroneous.[5] <u>See</u> Views of Commission at 16; Globe Brief at 15-31. The Court therefore limits its discussion to the ITC's main likely volume findings and Globe's contentions with respect to those findings.

Section 1675a(a)(2) states that "[i]n evaluating the likely volume of imports of the subject merchandise if the order is revoked . . . the Commission shall consider whether the likely volume of imports of the subject merchandise would be significant if the order is revoked . . . either in absolute terms or relative to production or consumption in the United States."[6] The ITC found that "the likely volume of subject imports from Brazil would not be significant either in absolute terms or relative to production or consumption in the United States if the order were revoked." Views of the Commission at 16; Def's Mem. Opp'n Pl.'s Mot. J. Agency R. ("ITC Brief") at 7.

Globe contends that the ITC's likely volume finding is erroneous and unsupported by substantial evidence on the record, and points to two specific actions that it argues Brazilian

---

[5] Globe argues that the ITC's volume finding is erroneous and, therefore, the ITC's price effects determination is also erroneous. Similarly, these two erroneous determinations render the ITC's impact determination erroneous. Globe Brief at 31-32.

[6] "'Significant' is defined as 'having or likely to have influence or effect[;] deserving to be considered[;] important, weighty, notable[.]'" <u>Gerald Metal, Inc. v. United States</u>, 22 CIT 1009, 1013, 27 F. Supp. 2d 1351, 1355 (1998) (brackets in original) (citation omitted).

producers are likely to take upon revocation of the order. First, Globe argues that Brazilian producers will divert current silicon metal production that is now going to the EU to the U.S. because of what Globe contends is a price incentive in the differential between EU and U.S. prices for silicon metal. See Globe Brief at 15-21. Second, Globe argues that Brazilian producers will engage in product-shifting (i.e., converting furnaces now making other products, like ferrosilicon, into furnaces making silicon metal), thus increasing their silicon metal capacity and production in order to take advantage of what Globe contends is a price incentive in the differential between U.S. ferrosilicon and silicon metal prices. Id. at 21-26. Globe points to evidence on the record that it argues supports its two contentions and thus renders the ITC Determination unsupported by substantial evidence. The Court disagrees and will address each of Globe's price incentive arguments in turn.

A.   EU/U.S. Price Differential Incentive

As part of its volume determination, the ITC found that "[w]hile the data are mixed, prices for silicon metal in the EU are generally similar to prices in the United States, providing no sustained price incentive for subject Brazilian producers to alter their . . . commercial relationships with their European purchasers in order to ship significantly increased volumes to the U.S. market

in the reasonably foreseeable future upon revocation of the order."
Views of the Commission (confidential version) at 28.

Plaintiff argues that the ITC's finding that the Brazilian producers subject to the order had no price incentive to divert significant volumes of silicon metal exports from their European customers to the United States is erroneous and unsupported by substantial evidence. See Globe Brief at 15. Specifically, Globe challenges the probative value of the ITC's price data metrics (i.e., the ITC's reliance on published spot market reference prices), and further challenges the ITC's finding, based on that price data, that prices in the EU were "generally similar" to, or "currently are approximately the same" as, prices in the U.S. Globe Brief at 15, 18; Views of the Commission at 16.

(i) Price Metrics

In determining the difference in price between silicon metal in the EU and the U.S., the ITC must establish which measurement it will use to compare prices. The ITC contends that published spot market reference prices are "key to - and probative of - the prices that would be charged for any likely increased volumes of subject imports should the [Brazilian antidumping duty] order be revoked."[7]

---

[7] The ITC notes that "[s]ales of silicon metal in the U.S. market are made on both a contract and spot basis" and that "[t]he silicon metal prices published by *Metal Bulletin* or *Ryan's*

(continued...)

ITC Brief at 17.

Globe contends that the most probative price data on the record is not the published spot market reference prices relied on by the ITC, but rather the Brazilian export statistics which show "the quantity and value of the Brazilian producers' actual export sales of silicon metal to the EU and the United States," and, similarly, certain other confidential price data on the record that reflect sales made to customers in the EU and U.S.[8]  Globe Brief at 16.  This "most probative price data", Globe argues, represents the actual prices received as opposed to general price levels and trends.[9]  Id.

The ITC's response to Globe is that the business proprietary data that Globe proposed (reflecting actual sales) was considered and found less probative than published spot market prices because, among other reasons, that data accounted for a low percentage of

---

[7](...continued)
*Notes* are sometimes used in price negotiations and are typically used for price adjustments within a contract." ITC Brief at 16, 17.

[8]  Globe explains that there are three types of EU and U.S. silicon metal price data on the record: (1) published spot market reference prices (from *Metal Bulletin*, *Ryan's Notes* and *CRU Monitor*); (2) Brazil's official export statistics; and (3) certain other business proprietary data. See Globe Brief at 16.

[9]  Globe notes that the "[p]ublished spot market reference prices [relied on by the ITC] reflect general price levels and trends in a given market, but do not represent the prices obtained by particular suppliers." Globe Brief at 16.

the quantity of subject imports from Brazil in 2000 to 2005. <u>See</u> ITC Brief at 15-16. Furthermore, the ITC noted that the Brazilian export statistics data was also considered and found less probative because that data is skewed by the exports from CBCC to its parent corporation, and as these are not arm's length transactions, "any comparison with transactions elsewhere in the world is invalid." ITC Brief at 17.

In determining whether the ITC's reliance on published spot market prices was appropriate in this context the Court is guided by the fact that "the resolution of [questions relating to 'the proper weight of evidence'] must be left to the expert factfinder." <u>Nippon Steel Corp.</u>, 458 F.3d at 1358. In assessing the various price metric data the ITC determined that spot prices were the most probative in this context. A reasonable argument can be made for using some form of the alternative price data proposed by Globe, but that is not the test here. The ITC, as the expert fact-finder, determined to use a data type that Globe concedes "reflect[s] general price levels and trends in a given market" and explained its reasons for preferring this data type over the others. Globe Brief at 16. The Court does not see anything on the record or in Plaintiff's arguments to render that determination unreasonable and, therefore, holds that the ITC's reliance on published spot market reference prices is both reasonable and supported by substantial evidence.

(ii) Silicon Metal Prices in the EU and U.S.

As stated above, the ITC determination found that "[w]hile the data are mixed, prices for silicon metal in the EU are generally similar to prices in the United States."  Views of the Commission at 16.  Globe contends that the ITC's finding that prices in the EU and U.S. were "generally similar" is erroneous and unsupported by substantial evidence.  Globe argues that the chart of spot prices that the ITC cites for support for this statement contradicts the ITC's conclusion, in that (1) spot market prices were "higher in the U.S. market [from January 2001 through September 2006]" except when briefly depressed by Russian imports; and (2) the "data indicate that the price gap between the two markets was growing at the end of the period."  Globe Brief at 17.  The ITC concedes that "prices in the United States had been somewhat higher than prices in the EU" but notes that "the average price differential for the period February 2006 to August 2006 was only 5.6 percent [and that] [t]his differential, which is not large in and of itself, is mitigated by the realities of the marketplace and conditions of competition."[10]  ITC Brief at 19-20.  The ITC also points out that

_____

    [10]  It is important to note that the ITC's finding of "generally similar" prices is not made in a vacuum, but rather is assessed in the context of determining whether a sustained price incentive exists ("[w]hen viewed in conjunction with the crucial importance of . . . customers and contracts in the EU . . . the need to undergo what may be a lengthy and expensive process to

                                                      (continued...)

the price differential between EU and U.S. prices was "only 4.8% in August 2006, the last month for which the appropriate pricing comparisons were available."  ITC Brief at 19.

In assessing the relative merits of the parties' arguments, the Court's role here is a clearly delimited one and "[i]t is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record."  Czestochowa (Stalexport) v. United States, 19 CIT 758, 763-64, 890 F. Supp. 1053, 1059 (1995) (citation and internal quotation omitted).  Globe must contend with the fact that "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n., 383 U.S. 607, 620 (1966) (citations omitted).

An answer to the question of what is, or is not, "generally similar," must acknowledge that any determination is situation-dependent and open to interpretation.  The real question here, however, is not whether U.S. prices are "generally similar" to EU prices, but rather whether the differential is such that it is likely to create a sustained price incentive for Brazilian

---

[10](...continued)
become certified/qualified . . . as well as the importance of the other non-price factors, the significance of this price differential is diminished substantially"). ITC Brief at 20.

producers to divert a significant quantity of silicon metal to the U.S. from the EU.[11]    Globe's contention, therefore, that spot prices were higher in the U.S. throughout the period of review, misses the point.    The relevant comparison is one of price differential, not relative price.   Plaintiff's other arguments on this issue revolve around (1) Globe's proposed alternative price data and what that data purportedly shows, and (2) spikes in various price data.   The Court discussed the former argument's merits <u>supra</u> in the discussion on price metrics, and states here, as to the latter argument, that price spikes do not equate to a sustained price incentive.   Collectively, the Globe arguments indicate, at best, nothing more than a differing interpretation of the record and that is not enough to conclude that the ITC's finding on this point is erroneous.   Therefore, in examining the record as a whole and considering the arguments put forth by Globe, the Court finds the ITC's determination that the EU/U.S. silicon metal price differential is not of such a magnitude that it is likely to create a sustained price incentive for Brazilian producers to divert silicon metal to the U.S. is reasonable and

---

[11]   There are specific slices of time where the EU/U.S. price gap appears to exceed what might reasonably be considered "generally similar," for instance, Globe contends that there was an approximately eight cent difference per pound (83.5 cents/lb. in the U.S. versus 75.24 cents/lb. in the EU) on September 26, 2006.   Globe Brief at 19.   The issue here, however, revolves around the question of a sustained price incentive, which is very different from periodic spikes in prices.

supported by substantial evidence.

For the reasoning set forth above, Globe's related argument, that the ITC determination that EU and U.S. prices were "currently approximately the same" is erroneous and unsupported by substantial evidence, is less than convincing.[12]  See Globe Brief at 18-21.

B.    Product Shifting Analysis

In its evaluation of the likely volume of imports of the subject merchandise if the order is revoked and whether that likely volume would be significant, the Commission "shall consider all relevant economic factors, including . . .(D) the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products."[13] § 1675a(a)(2)(D).

(i) Product-shifting from ferrosilicon to silicon metal

The ITC found that  the "evidence is mixed regarding the

_____

[12] Globe argues that the last month for which price data was available was September 2006 (an 8 cents or 11% difference in EU/U.S. price) and not August 2006 (a 4.8% difference), as the ITC contends. See Globe Reply Brief at 9.  But the ITC points out that the underlying Globe data reveals "the price differential on July 7 was 1.18 cents, and the price gap on September 22 was 4.40 cents."  ITC Brief at 22.

[13] Although Globe's argument focuses on the potential for product shifting, the ITC is charged with considering three other volume-specific economic factors relating to likely increases in production capacity, existing inventories and the existence of barriers to importation. § 1675a(2)(A)-(C).

required time and cost to shift production from ferrosilicon to silicon metal and does not necessarily support a finding that product shifting was technologically or financially attractive."[14] Views of the Commission at 18; ITC Brief at 23. The ITC in its brief argues that "it is well documented that to certain producers and under certain circumstances, the conversion of furnaces from the production of ferrosilicon to silicon metal is virtually unattainable."[15] ITC Brief at 30-31.

Globe argues that it calculated the price difference between ferrosilicon and silicon metal prices that would provide the required incentive to convert furnaces from ferrosilicon to silicon metal production and concludes that "currently and over most of the POR, there was a clear economic incentive to convert furnaces from ferrosilicon production to silicon metal production if the silicon metal order were not in place."[16] Globe Brief at 26. The ITC does

---

[14] The ITC notes that the Brazilian respondents to the questionnaire stated that they would require a significant amount of time and money to convert furnaces for product-shifting. Views of the Commission at 30, n.120 (confidential version); ITC Brief at 30 (confidential version).

[15] The ITC notes that the type of electrode normally used to produce ferrosilicon (i.e., the self-baked or Söderberg type), if used to produce silicon metal, will result in a higher iron content than is acceptable by "at least some silicon metal customers." ITC Brief at 31, n.16. Replacing a Söderberg electrode entails reinforcing the structure of the furnace building and making certain other replacements. Id.

[16] Globe states that its calculation "took into account (1)
(continued...)

not contest the Globe formula, per se, but contends that "[t]he per-unit cost of converting a ferrosilicon furnace to one producing silicon metal is only one factor involved in analyzing economic incentive, and is not the most important factor."[17] ITC Brief at 2.

The ITC points out that a number of non-price factors are important in the purchase of silicon metal, noting that silicon metal purchasers designated non-price factors such as product consistency, reliability of supply, availability and delivery times as "very important" more often than they listed price as "very important." ITC Brief at 14. The ITC also argues that beyond the non-price factors listed above there are other significant barriers and considerations which argue against any significant product shifting. The ITC points out that ten of fourteen silicon metal purchasers responding to its questionnaire require that all product they purchase be "certified or prequalified . . . [and that] none of the subject Brazilian producers was reported to be currently certified or qualified to supply U.S. purchasers."[18] ITC Brief at

---

[16](...continued)
the difference between Brazilian producers' per unit ferrosilicon and silicon metal production costs, (2) the difference in the ferrosilicon and silicon metal production volumes for converted furnaces, and (3) the per-unit cost to convert furnaces from ferrosilicon to silicon metal production." Globe Brief at 24.

[17]  The ITC notes that "[i]n making its volume finding, [it] focused its analysis on a number of factors, including pricing data, with no single factor overriding another." ITC Brief at 1.

[18]  The ITC also notes that certification may require as long
(continued...)

15.  Lastly, the ITC stressed that the Brazilian producers have established profitable commercial relationships with EU companies, which they would have to forgo to shift product to the U.S.[19] Views of the Commission at 16.

The Court therefore must assess whether the ITC reasonably determined that the higher price[20] of silicon metal versus ferrosilicon over the last few years, when one factors in the non-price factors and barriers to product-shifting, would not be enough of an incentive to result in the likely volume of imports being significant if the order were revoked.  In answering this question,

---

[18](...continued)
as 18 months and that the certification and qualification process may also be quite expensive. See ITC Brief at 15. The ITC adds that this procedure would only make Brazilian producers eligible to sell to these certification-requiring purchasers and would not necessarily lead to actual sales. See id.  Globe counters, however, that there is evidence on the record that Brazilian producers' current  qualification to sell to certain companies in Brazil would enable them to obtain qualification to sell to those same companies in the U.S. on an accelerated basis. Pl.'s Reply Mot. J. Agency R.("Globe Reply Brief") at 12-13.

[19]  As would be expected, Globe points to evidence on the record that it argues mitigates the ITC contentions on non-price factors ("price was rated as a '"very important"' or '"somewhat important"' factor by 14 out of 14 purchasers"); licensing/prequalification ("subject Brazilian producers were already qualified to sell to Alcoa in Brazil, which would enable them to qualify for sales to Alcoa in the U.S. on an accelerated basis"); and established EU relationships ("[Brazilian producers] had only [confidential number] contracts that the Commission considers long-term"). Globe Reply Brief at 12, 13; Globe Brief at 7.

[20]  See supra for the Court's discussion on the difference between silicon metal and ferrosilicon prices.

the Court finds that, as discussed <u>supra</u>, there is substantial evidence on the record that a per-unit-cost-based analysis is but one quantitative factor of many when considering product-shifting. Furthermore, the Court finds that there is substantial evidence on the record that non-price factors would be a very important component to any decision by a Brazilian producer. These two findings support the ITC determination that the evidence on the record did not necessarily support a finding that product shifting was technologically or financially attractive.

Therefore, the Court finds that the ITC's conclusion that they do not find that "Brazilian producers capable of doing so are likely to shift production from ferrosilicon to silicon metal if the order is revoked or that, even if some shifting were to occur, it would lead to significant increases in subject imports from Brazil", to be reasonable and supported by substantial evidence on the record. Views of the Commission at 18.


    (ii) Product-shifting from silicomanganese to silicon metal
and the scope of the product-shifting investigation

    Globe also raises the issue of a second type of potential ferroalloy conversion that the ITC did not specifically consider - shifting from silicomanganese to silicon metal production - and notes that "Brazilian silicomanganese producer SIBRA . . . converted two furnaces from silicomanganese to silicon metal in

1997."[21] Globe Brief at 23.  The ITC concedes that it did not separately consider the potential of shifting from silicomanganese to silicon metal production, but notes that "neither Globe nor any other party mentioned silicomanganese production in their prehearing briefs, at the hearing or in their posthearing briefs . . . [and that] all parties focused on the ability to convert furnaces used to produce ferrosilicon to those used to produce silicon metal." ITC Brief at 28.  Accordingly, the ITC contends that the statute requires addressing only "relevant arguments that are made by [the] parties," and the fact that this specific type of conversion was not treated as an "important issue" by any of the parties signifies its lack of relevance.[22]  Id.

Giving the Globe argument due consideration, the Court finds that the ITC reasonably and supported by substantial evidence, made a determination that product-shifting is a time-consuming and costly option and that, more importantly, this option is in no way guaranteed to lead to any financial gain.  The fact that the ITC

---

[21] Globe points out that silicon metal is produced in submerged arc electric furnaces that can also be used to produce other products, including ferrosilicon and silicomanganese. Globe Brief at 10.

[22]   19 U.S.C. § 1677f(i)(3)(B) states: the Commission shall include in a final determination of injury an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties who are parties to the investigation or review (as the case may be) concerning volume, price effects, and impact on the industry of imports of the subject merchandise.

did not specifically investigate the potential for silicomanganese product-shifting does not render the ITC determination erroneous nor unsupported by substantial evidence nor does it mean that its findings and conclusions only apply to that form of product-shifting. The ITC's finding as to non-price factors and pre-qualification/certification, for instance, are not ferrosilicon-producer specific. The ITC determination on product-shifting is more comprehensive than the Globe narrow reading would have this Court believe, and applies to producers of ferrosilicon as well as silicomanganese.

Lastly, Globe argues that the ITC "[b]y restricting its analysis to the production facilities of [a specific confidential amount] Brazilian silicon metal producers subject to the order that produce ferrosilicon - and excluding the production facilities of ferrosilicon producers that did not currently produce silicon metal and silicomanganese producers - the Commission unlawfully narrowed its examination of this mandatory statutory factor." Globe Brief at 23 (confidential version). The ITC counters that "[c]ontrary to Globe's assertions, the ITC did not restrict its analysis to the production facilities of [a specific confidential amount] Brazilian producers; it referred to at least [a specific confidential amount]." ITC Brief at 29 (confidential version).

The Court refers to its discussion supra on the general applicability of the ITC's product-shifting findings. The ITC's

determination on product-shifting is not limited to Brazilian silicon metal producers subject to the order that also produce ferrosilicon, but applies to product-shifting to silicon metal generally. The Court finds therefore that the ITC's analysis was not restricted or deficient, as argued by Globe, and that the ITC met its statutory obligation under § 1675a(a)(2)(D).

C.    Contesting the Price and Volume Methodology

In each of the arguments posed by Globe it attacks the substantiality of the evidence supporting the ITC's findings by proffering its own evidence supporting the opposite conclusion or cherry-picking from selective evidence on the record. Although, for instance, the approach Globe has taken in its per-unit cost of converting a furnace calculations has some merit, it also has its problems, as discussed above. This Court has stated before that no methodology is perfect and that weighing evidence and counter-evidence must be left to the ITC as the expert fact-finder. See Nippon Steel Corp., 458 F.3d at 1358.

As discussed supra, Globe's challenge in contesting the ITC's final determination is not an easy one. Accordingly, the question for this Court is "not whether we agree with the Commission's decision, nor whether we would have reached the same result as the Commission had the matter come before us for decision in the first

instance." <u>United States Steel Group v. United States</u>, 96 F.3d 1352, 1357 (Fed. Cir. 1996).  Regarding the valid considerations raised by Globe, it is important to note that the fact that a challenging party seeking review:

> can point to evidence [on the] record which detracts from the evidence which supports the [International Trade] Commission's decision and can hypothesize a reasonable basis for a contrary determination is neither surprising nor persuasive. It is not the function of a court to decide that, were it the Commission, it would have made the same decision on the basis of the evidence.

<u>Matsushita Elec. Indus. Co., Ltd. v. United States</u>, 750 F.2d 927, 936 (Fed. Cir. 1984).  This Court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion."  <u>Altx, Inc. v. United States</u>, 370 F.3d 1108, 1121 (Fed. Cir. 2004)(internal quotations omitted).

In formulating its final determination the ITC has considered all requisite statutory factors, including many factors not contested by Globe.  While true that certain evidence on the record detracts from its findings, it is also true that neither that evidence nor Globe's arguments necessitate a determination by this Court that those findings are anything but reasonable or supported by substantial evidence.  The Court is satisfied that the ITC has thoroughly explained the basis for its volume determinations and in that process addressed the relevant arguments made by Globe

concerning price incentives and product-shifting.  Therefore, for the reasons stated above, the Court finds that the ITC's determination with respect to likely volume is reasonable, supported by substantial evidence and otherwise in accordance with law.

**III. The ITC's Findings On Likely Price Effects And Likely Impact Are Supported By Substantial Evidence And Otherwise in Accordance With Law**

Plaintiff challenges the ITC's conclusions with respect to likely price effects and likely impact on the domestic industry only insofar as they incorporate the ITC's findings that likely volume effects of the subject imports would not be significant. Globe does not put forth an independent challenge to the ITC's findings on either price effect or the impact of imports of the subject merchandise on the industry if the order is revoked.

As discussed <u>supra</u>, the Court affirms the ITC's determination that the likely volume of subject imports would not be significant upon revocation of the order.  The Commission's conclusions with respect to likely volume are reasonable and supported by substantial evidence – even though they may not be the only possible reasonable conclusions to be drawn from the record. Accordingly, because Globe's arguments as to likely price effect and impact are premised on the ITC's likely volume finding, the Court finds the ITC's findings as to both reasonable, supported by

substantial evidence and otherwise in accordance with law.


## <u>CONCLUSION</u>

In accordance with the foregoing, the Court affirms the ITC Determination. Plaintiff's motion for judgment upon the agency record is denied, and this action is dismissed.


                                    /s/ Nicholas Tsoucalas
                                    NICHOLAS TSOUCALAS
                                    SENIOR JUDGE


Dated:     March 19, 2008
           New York, New York